UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------------:
ROMA ARTES,                                              :
                      *Plaintiff*,    :    Docket No. 25-cv-
                               :
     - against -                                      :    **COMPLAINT**
                               :
FOOD SYSTEMS UNLIMITED, INC., CHINA       :
CHAO, INC., BIAGIO SCHIANO, and           :    **Trial by Jury Demanded**
ROY HUI,                                                 :
                    *Defendants*.    :
-------------------------------------------------------------------:

      **Plaintiff ROMA ARTES** ("Plaintiff"), by and through her attorneys, Law Offices of

Manuel B. Quintal, P.C., for her Complaint against Defendants FOOD SYSTEMS

UNLIMITED, INC. ("Food Systems"), CHINA CHAO, INC. ("China Chao"), BIAGIO

SCHIANO ("Schiano"), and ROY HUI ("Hui"), alleges as follows:

<u>**PRELIMINARY STATEMENT**</u>

     1.     Plaintiff asserts claims arising from violations of her rights under the Trafficking

Victims Protection Act, as amended ("TVPA", 18 U.S.C. §1589, 18 U.S.C. §1590 and 18 U.S.C.

§ 1594).

     2.     Plaintiff claims that Defendants conspired with one another to engender policies,

scheme, and/or a work environment that resulted in the forced rendition of her continued labor or

services in that if she did not continue her services, she believed she would suffer serious harm.

     3.     By threatening Plaintiff that if she did not follow Defendants' work instructions,

she would lose her job and be reported to immigration authorities and be subjected to possible

deportation, Defendants were able to subtly obtain the continuing labor or services of the

Plaintiff.

4.    Plaintiff was forced under the circumstances to continue working for Defendants despite her uneasiness, reluctance and objection to follow Defendants' work-instructions and policies, because of Defendants' threats to terminate her employment and/or to report her to immigration authorities and be subjected to possible deportation.

## JURISDICTION AND VENUE

5.    This Court has jurisdiction pursuant to 18 U.S.C. §1595(a), because the case involves a federal question, this action arising under the TVPA. Alternatively, the Court has diversity jurisdiction.

6.    Venue is proper in this District pursuant to 28 U.S.C. §1391(b) because a substantial part of the events or omissions giving rise to the claims occurred in the Eastern District of New York.

## PARTIES

7.    Plaintiff Roma Artes is a citizen of the Philippines and a resident of the County of Queens, State of New York.

8.    Defendant Food Systems was and still is a foreign domestic corporation organized and existing pursuant to the laws of the State of New York. Upon information and belief, it is headquartered at 750 Florida Central Parkway, Longwood, State of Florida.

9.    Defendant China Chao was and still is a foreign domestic corporation organized and existing pursuant to the laws of the State of New York. Upon information and belief, it is likewise headquartered at 750 Florida Central Parkway, Longwood, Florida.

10.    Upon information and belief, Defendant Food Systems owns and/or operates Defendant China Chao, and/or the two fast-food restaurants named Asian Chao and Fuji Grill at

the Roosevelt Field Mall on Long Island, specifically at 630 Old Country Road, Garden City, NY 11530.

11.     Defendant Biagio Schiano, upon information and belief, is a resident of the State of Florida and is the President and/or Chief Executive Officer of Defendants Food Systems and China Chao.

12.     Upon information and belief, Defendant Schiano communicated with an individual or agency in New York and caused the incorporation of Defendant Food Systems with the New York State Department of State as a foreign business corporation sometime in or about December 2001.

13.     Upon information and belief, Defendant Schiano communicated with an individual or agency in New York and caused the incorporation of Defendant China Chao with the New York State Department of State as a foreign business corporation sometime in or about March 2003.

14.     Defendant Schiano has authority to make payroll and personnel decisions for Defendants Food Systems and China Chao.

15.     At all relevant times, Defendant Schiano owned, operated, and/or controlled, and/or managed Defendants Food Systems and China Chao.

16.     At all relevant times, Defendant Schiano participated in running the daily operations of Defendants Food Systems and China Chao.

17.     At all relevant times, Defendant Schiano participated in the management and supervision of Plaintiff Artes and her work for Defendants Food Systems and China Chao.

18.     At all relevant times, Defendant Schiano exercised operational control over Defendants Food Systems and China Chao, controlled significant business functions of

Defendants Food Systems and China Chao, and acted on behalf of and in the interest of Defendants Food Systems and China Chao in devising, directing, implementing, and supervising the wage and hour practices and policies relating to their employees, including as to those policies applied to Plaintiff and to their Long Island employees.

19.    Upon information and belief, Defendant Schiano regularly coordinated with and communicated with Defendants' District Managers in New York, whether by phone call, text message or electronic mail, in directing and supervising the operations of Defendants Food Systems and China Chao's fast-food restaurants on Long Island.

20.    Upon information and belief, Defendant Roy Hui is a resident of the State of Florida and is the Vice President for Operations of Defendants Food Systems and China Chao.

21.    Defendant Hui has authority to make payroll and personnel decisions for the Defendants Food Systems and China Chao.

22.    At all relevant times, Defendant Hui operated, and/or controlled, and/or managed Defendants Food Systems and China Chao.

23.    At all relevant times, Defendant Hui participated in running the daily operations of Defendants Food Systems and China Chao.

24.    At all relevant times, Defendant Hui participated in the management and supervision of Plaintiff Artes and her work for Defendants Food Systems and China Chao.

25.    At all relevant times, Defendant Hui exercised operational control over Defendants Food Systems and China Chao, controlled significant business functions of Defendants Food Systems and China Chao, and acted on behalf of and in the interest of Defendants Food Systems and China Chao in devising, directing, implementing, and supervising

the wage and hour practices and policies relating to their employees, including as to those policies applied to Plaintiff and to their Long Island employees.

26.    Upon information and belief, Defendant Hui regularly coordinated with and communicated with Defendants' Store Managers and District Managers in New York, whether by phone call, text message or electronic mail, in directing and supervising the operations of Defendants Food Systems and China Chao.

27.    During the relevant period, Defendant Hui went to visit and inspect the two Long Island fast-food restaurants several times in his capacity as the former District Manager and as the current Vice President for Operations.

28.    Defendants Schiano and Hui possess operational control over Defendants Food Systems and China Chao, and control significant functions of Defendants Food Systems and China Chao.

29.    Upon information and belief, during the relevant period, Defendants Schiano and Hui each monitored the operations of the two Long Island fast-food restaurants by regularly looking and accessing from their Florida headquarters the CCTV video camera placed at said Long Island restaurants.

30.    Upon information and belief, during the relevant period, Defendants Schiano and Hui each caused the sending of communications to the two Long Island restaurants, including, among others, payroll checks, to be given to Plaintiff and to other employees.

31.    Defendants are associated and joint employers, act in the interest of each other with respect to employees, are responsible for paying employees, and share control over the employees.

32.    Each Defendant possessed substantial control over Plaintiff's working conditions, and over the policies and practices with respect to the employment and compensation of Plaintiff.

33.    Defendants dictated, controlled, and ratified the wage and hour and all related employee compensation policies at the two Long Island fast-food restaurants during Plaintiff's employment.

34.    Defendants Schiano and Hui exercised complete domination and control of Defendants Food Systems and China Chao in respect to the conduct alleged in this Complaint, including violations of the Trafficking Victims Protection Act designed to coerce the continued performance of Plaintiff's services.

35.    Defendants Schiano and Hui each used his complete domination and control of Defendants Food Systems and China Chao to commit wrongs against Plaintiff, including violations of the TVPA.

36.    Upon information and belief, Defendants Food Systems and China Chao have common ownership.

37.    Upon information and belief, Defendants Food Systems and China Chao are owned and/or operated by Defendant Schiano, President and CEO.

38.    Defendants have interrelated operations.

39.    Defendants have common management.

40.    Defendants have a centralized control of labor relations

41.    Defendants Food Systems and China Chao share the same corporate office address in Longwood, State of Florida.

42.    Defendants are associated in fact and comprise a venture as that term is used in the TVPA, 18 U.S.C. §§ 1589 and 1595.

## STATEMENT OF FACTS

43.    In or about June 2015, Plaintiff Artes was hired by Defendant Food Systems to work at its Tobu Grill fast-food restaurant at the Florida Mall in Orlando, Florida.

44.    During her employment at Defendant Food Systems's Florida restaurant, Plaintiff worked either as a front server, or a cashier or a person-in-charge.

45.    Plaintiff left her employment with Defendant Food Systems in May 2018 to move to New York.

46.    Sometime in March 2021, Defendant Food Systems's new Vice President for Operations, Arsenio Hinojosa, called up Plaintiff in New York and inquired if Plaintiff had relatives and friends in New York whom he could hire to work for the Asian Chao fast-food restaurant at the Roosevelt Field Mall in Garden City, New York.

47.    Arsenio Hinojosa offered Plaintiff to become the new General Manager of the Asian Chao restaurant in Garden City, New York and required her to start the hiring process, as Defendants had planned to replace the existing Chinese crew with mostly Filipino employees.

48.    Defendants' Hinojosa directed Plaintiff to hire as many as thirty (30) to thirty five (35) individuals, and that even if these individuals did not have any legal papers, Defendants, specifically Mr. Hinojosa himself, informed Plaintiff that Defendants would find ways to make these individuals eligible to work.

49.    Defendants' Hinojosa informed Plaintiff that a prospective employee with valid state identification card and social security number would be eligible to work for Defendants.

50.     Defendants knew that Plaintiff's H-2B nonimmigrant status had expired, but that Plaintiff had valid state ID and valid social security number.

51.     Despite knowing about Plaintiff's immigration status, Defendants nonetheless hired the services of Plaintiff to be their General Manager at the Asian Chao restaurant on Long Island, New York.

52.     As early as April 2021, Plaintiff started looking for individuals to hire for Defendants' Asian Chao restaurant on Long Island. Defendants sent application forms and even uniforms to Plaintiff's home address in Queens, New York to distribute to work applicants and prospective employees.

53.     At that time, Defendants' Hinojosa advised Plaintiff that his target date for Plaintiff and her Filipino crew to take over the operations of the Asian Chao restaurant from the Chinese crew would be July 2021.

54.     The individuals contacted by Plaintiff to hire for Defendants numbered about twenty (20). Each of these individuals filled out application forms and submitted their credentials which Plaintiff in turn forwarded to Defendants' Hinojosa.

55.     It was Defendants' Hinojosa who had the final say whether or not an individual had the requisite documents and information to be hired.

56.     Defendants made the determination whether a prospective employee had a valid social security number or not.

57.     Upon information and belief, there were prospective employees who had dubious identification cards and/or social security numbers, but were still hired by Defendants.

58.    Plaintiff noticed that on several cases, it was Defendants' Hinojosa himself who provided identification cards and/or social security numbers for prospective employees whom he subsequently decided to hire and employ.

59.    Sometime in early May 2021, Defendants' Hinojosa communicated to Plaintiff that Defendants' owner had wanted to replace the Chinese crew sooner than July 2021 and instructed Plaintiff to bring her potential hires to meet with him.

60.    On May 9, 2021, Plaintiff and about twenty (20) Filipino work-applicants met with Defendants' Hinojosa at a Carle Place hotel on Long Island for Mr. Hinojosa to interview and hire.

61.    On May 10, 2021, Defendants' Hinojosa, in the presence of several Florida-based workers whom he had brought with him, and also in the presence of Plaintiff and Ryan Enguerra, whom Mr. Hinojosa had likewise hired to work at the Roosevelt Field Mall, terminated the services of the Chinese crew at the Asian Chao fast-food restaurant.

62.    On May 10, 2021, Plaintiff and Ryan Enguerra, upon the instructions of Defendants' Hinojosa, helped clean up and arranged stocks and utensils at the Asian Chao fast-food restaurant at the Roosevelt Field Mall in preparation for the next days' re-opening with mostly Filipino crew.

63.    Starting on May 11, 2021, Plaintiff and her Filipino crew, assisted by a few workers coming from Florida who were brought along by Defendants' Hinojosa, began manning, preparing foods, and serving customers at the Asian Chao and the adjoining Fuji Grill restaurants, both of which were, upon information and belief, owned and operated by Defendants.

64.    During the first three weeks after taking over the Chinese crew, Plaintiff and her Filipino crew each worked from opening to closing hours, seven days a week, with no days off. Their work schedules during that period were as follows:

| | |
|---|---|
| Monday to Thursday | = from 9:30 AM to 8:30 PM |
| Friday and Saturday | = from 9:30 AM to 9:30 PM |
| Sunday | = from 9:30 AM to 7:30 PM |

65.    It was only sometime on the fourth week that the Filipino crew were given a day or two days of rest per week.

66.    Because the Filipino crew members were regularly required to work from opening to closing hours, several of them decided to quit.

67.    Plaintiff, as well as her Filipino crew, regularly worked more than forty (40) hours per week at Defendants' Long Island restaurants, where they provided various services, including, preparing and cooking Chinese dishes for the Asian Chao restaurant; and preparing, cooking, and serving teriyaki dishes at the Fuji Grill restaurant.

68.    Plaintiff was paid on a salary-basis.

69.    As the store's General Manager, Plaintiff was charged with and did render services such as, among others, coordinating the front of the house and the back of the house restaurant operations, hiring required employees, setting work schedules, overseeing food preparation, and making sure health and safety restaurant regulations were complied with.

70.    The rest of the Filipino crew, as well as subsequently-hired employees who were non-Filipinos, were each paid on an hourly-basis, initially every two weeks.

71.   Plaintiff found Defendants' Hinojosa to be a strict and stern slave master. Even while Plaintiff was designated the store's General Manager, she was not really given the freedom and discretion to manage her store. Everything needed to be approved by the Vice President.

72.   Defendants had caused a CCTV video camera to be placed at the Long Island restaurants such that Defendants, more particularly Mr. Hinojosa, could monitor and see from their Florida headquarters all the activities and happenings at the Long Island restaurants as they were actually happening.

73.   Oftentimes when Plaintiff would take a break to go to the restroom, Defendants' Hinojosa would immediately ask for her whereabouts as he could not see her on the camera.

74.   Every so often, Defendants' Hinojosa would notify Plaintiff that he had been taking pictures of Plaintiff while she was doing her job to impress on Plaintiff that he was monitoring everything that was happening at the Long Island restaurants.

75.   Sometime in March 2023, Plaintiff decided to leave her employment with Defendants as the toll of working from opening hours to closing hours almost every day had made her physically and mentally stressed out.

76.   As early as sometime in July 2023, Defendants' Hinojosa and Defendant Roy Hui started communicating with Plaintiff and with Ryan Enguerra to convince them to return to work for Defendants' Long Island fast-food restaurants.

77.   At that time, Mr. Hinojosa was still Defendants' Vice President for Operations and Roy Hui was the District Manager for the New York-Boston area.

78.   Defendants' Hinojosa and Defendant Hui promised Plaintiff and Mr. Enguerra that their work conditions would be improved, such that they would allegedly work no more than fifty (50)  to fifty five (55) hours per week.

79.     Defendants re-hired the services of Plaintiff and of Mr. Enguerra on October 8, 2023. Plaintiff was to resume her role as General Manager, while Mr. Enguerra was to be in-charge of kitchen operations for both restaurants.

80.     Upon her return to work, Plaintiff found out that not much had changed regarding her work schedules. Because there were not enough individuals willing to work for Defendants, Plaintiff, as well as several employees, had to work from opening hours to closing hours on a regular basis.

81.     In December 2023, Plaintiff worked regularly about seventy four (74) hours per week as a result of her working from opening hours to closing hours at least six (6) days a week.

82.     On or about December 22, 2023, Plaintiff sent a text message to Defendant Hui, her District Manager, and inquired whether she would receive extra compensation for working at least seventy four (74) hours per week.

83.     Defendant Hui responded that Plaintiff's working 74 hours per week would not receive any extra compensation as such long hours would be taken into account for any manager's bonus that would be given her, and that her working at least six (6) days per week was no different from the schedules of other store General Managers in Florida.

84.     Plaintiff replied that to her knowledge the store General Managers in Florida were not required to report to work from opening hours to closing hours six (6) days a week, which she was being made to do.

85.     Defendant Hui did not make any comment or reply.

86.     On or about January 10, 2024, there was a severe snow storm on Long Island that resulted in the Roosevelt Field Mall losing its electrical supply and forcing the eventual closure of its tenant-stores.

87.    Upon information and belief, the mall operators did not know when they could restore electricity at the mall.

88.    Defendants instructed Plaintiff to make sure that the two restaurants' supplies of chicken meat, as well as vegetables and other meats, be transferred from the walk-in cooler to the freezer so that these would not spoil.

89.    Plaintiff informed Defendants that there were no longer employees in the stores except for her and for Mr. Enguerra who was scheduled to work from opening hours that day, and who Plaintiff asked to assist her in carrying the more than twenty (20) boxes of food supplies, with a box weighing about forty (40) pounds each, from the walk-in cooler to the freezer.

90.    Defendant Hui forwarded by text message the instruction by Vice President Hinojosa that Plaintiff, as the Store Manager, should not leave the mall until electricity was restored or if not yet restored, until late in the evening, so that the chicken meat stocks and vegetables would be brought back to the walk-in coolers so that these would be ready to be used and not frozen the following day.

91.    Plaintiff responded that she had already done the transfer of the supplies and stocks from the walk-in cooler to the freezer with the help of Mr. Enguerra.

92.    Plaintiff also advised Defendant Hui that considering she was female, she felt unsafe staying behind by herself at the food court of the mall which was then very dark and cold, and was happy that Mr. Enguerra had stayed behind to accompany and assist her carry the supplies and stocks which she would have not done on her own.

93.     Defendant Hui acknowledged that Plaintiff indeed was a woman, and even advised her to call him to discuss further, but when Plaintiff did, Defendant Hui would no longer take the call.

94.     Plaintiff and Mr. Enguerra left the mall's food court area around 7:30 in the evening of January 10, 2024.

95.     Upon information and belief, Mr. Enguerra expected to be paid for his hours of work during that day.

96.     Unfortunately, Defendants decided not to compensate Mr. Enguerra for his hours of work on January 10, 2024 despite their knowledge that he actually did work for the benefit of Defendants that day.

97.     Mr. Enguerra verbally complained to the Plaintiff about not getting paid for his services on January 10, 2024.

98.     Plaintiff promised to advocate for him with Defendants.

99.     Defendants denied Plaintiff's advocacy for Mr. Enguerra to be paid on the ground that there was allegedly no budget to pay him for his services.

100.     Defendant Hui told the Plaintiff that if Mr. Enguerra insisted on getting paid, that Mr. Enguerra could simply quit and find work elsewhere, and that Defendants could easily find a replacement for him.

101.     Plaintiff relayed Defendants' response to Mr. Enguerra.

102.     Upon information and belief, Mr. Enguerra, after having heard of Defendants' response to his request to be paid for his services on January 10, 2024, decided not to press his demand to be paid for his services as he did not wish to lose his job.

103.    Defendants' response to Mr. Enguerra's request to be paid for services rendered was similar or identical to Defendants' responses to other employees' complaints about conditions of work.

104.    Defendant Hui replaced Arsenio Hinojosa as the Vice President for Operations sometime July 2024. Defendant Hui remains as Defendants' Vice President for Operations to date.

105.    During all times relevant, there had been occasions when individual employees complained to Plaintiff about their schedules and their long hours.

106.    Every time she received any employee complaints, Plaintiff would forward and discuss these complaints with Defendant Hui, in his previous capacity as the District Manager, and in his current position as the Vice President for Operations.

107.    Defendant Hui's response to these employee complaints was always the same or identical. He told Plaintiff to remain steadfast about the schedulings and work-hours and to tell any complaining or uncooperative employee that if s/he did not like the schedules, that said employee could find work elsewhere and that the door was open for him/her to leave. Defendant Hui wanted Plaintiff to impress upon any complaining worker or any employee causing difficulty in schedulings that employees were easily dispensable.

108.    On a few occasions, Defendant Hui specifically ordered Plaintiff to remove a repeat-complaining employee from any schedules, and remarked: "If they have no schedules, they would have no work and they would be hungry, and they would come back to work again".

109.    Similarly, on a couple of occasions, such as on August 16, 2024 and on October 19, 2024 when Defendant Hui was on Long Island, Defendant Hui remarked to Plaintiff that he knew several of the employees did not have any legal immigration papers or were

undocumented, and that if such a complaining or difficult employee did not have any legal papers, that Plaintiff should tell the employee that Defendants could and would report him/her to immigration authorities and would thereby be subject to possible deportation.

110.    On these occasions, Defendant Hui told Plaintiff that threatening to report any difficult employee to immigration authorities, if such employee did not have legal papers, would definitely make the employee quiet and comply with any work-instructions.

111.    Defendants, including Defendant Hui, knew that Plaintiff's nonimmigrant status had expired and that Plaintiff no longer had valid immigration status.

112.    Plaintiff understood that Defendant Hui's comments about Defendants' reporting undocumented workers to immigration authorities for possible deportation were directed to her as well.

113.    Upon information and belief, Defendant Hui's response to and comments about complaining employees were with the knowledge of and with the ratification by Defendant Schiano, the President and Chief Executive Officer of both Defendant companies.

114.    Following Defendant Hui's instructions, Plaintiff would relay Defendants' response to complaining employees about sticking to the schedules or work-hours under pain of losing their employment, or of being removed from any work schedules at all.

115.    Plaintiff, however, kept to herself the comment by Defendant Hui that Defendants could and would report to immigration authorities any undocumented worker who had complaints or who was causing problems at work.

116.    Plaintiff could not bear sharing Defendants' threats of reporting any complaining undocumented worker to immigration authorities as she herself did not have legal working

papers even though she knew Defendant Hui was serious in doing so to any uncooperative employee.

117.    Sometime on or about May 29, 2024, Defendant Hui sent a text message to Plaintiff to expect a call from Defendants' Human Resources Department regarding a question about then-Vice President Hinojosa.

118.    Sometime thereafter, Defendants' Ms. Audrey called up Plaintiff and inquired about an email message previously sent by Mr. Hinojosa promising a $20,000 owner bonus to Plaintiff's store for having met the target sales benchmark.

119.    During this conversation with Defendants' Ms. Audrey, Plaintiff informed the Human Resources officer of her and her co-employees' regular long work-hours; that as a result of her long hours, she barely had time to rest which caused her to collapse one time on a street in Flushing; that Mr. Hinojosa and Defendant Hui had caused her to stay and work unsafely on January 10, 2024 even while there was no electricity at the mall, and; that Mr. Enguerra was not compensated for his services on January 10, 2024.

120.    On May 30, 2024, Defendant Hui sent another text message to Plaintiff advising her that there would be a phone conference the following day with the Vice President, the Human Resources officer, with him, and with the Plaintiff to discuss about New York labor laws.

121.    On May 31, 2024, a phone conference was held among Defendants' Mr. Hinojosa, Defendant Hui, Ms. Audrey, and the Plaintiff.

122.    During the conference, Defendants instructed Plaintiff to start preparing work schedules such that employees would no longer be working back-to-back opening to closing hours, until such time that there would be enough employees so that nobody would be working from opening to closing hours anymore.

123.    It was during this May 31, 2024 phone conference that Plaintiff heard for the first time of what Defendants' officers called New York Labor Law of spread-of-hours pay. Plaintiff was informed by Defendants' officers that any employee working a spread of at least ten (10) hours during any given work-day should receive an extra fifteen dollars ($15.00) for that day.

124.    As a result of the May 31, 2024 phone conference, Plaintiff began to look for more employees to hire so that there would be enough employees such that nobody would be working from opening to closing hours anymore.

125.    Unfortunately, there were not enough applicants desirous to work for Defendants' two Long Island fast-food restaurants.

126.    On or about June 17, 2024, Defendants started paying spread-of-hours pay at the rate of fifteen dollars ($15.00) per day to eligible employees working at Defendants' two fast-food restaurants managed by the Plaintiff.

127.    On August 16, 2024, Defendant Hui, who was the newly appointed Vice President  replacing Arsenio Hinojosa, visited the Long Island restaurants and met with Plaintiff and several employees.

128.    During this meeting, Defendant Hui gave a merit increase to several employees, including Mr. Enguerra, Mr. Rubi Martinez, and Mr. Ezequiel Rogelio Aziaga. He increased the hourly rates of these employees.

129.    Defendant Hui separately met with Plaintiff and instructed Plaintiff that when Plaintiff prepared the store payroll, Plaintiff should automatically indicate eight (8) hours of overtime hours for each of the three employees who just received a merit increase, regardless of the actual number of hours each worked.

130.    Defendant Hui also instructed Plaintiff to prepare two separate work-schedules: (i) one, to post at the store that would be seen by each employee, whereby there would be schedules including working from opening to closing hours, and; (ii) a second set, to be sent to corporate office, and which one would indicate limited opening to closing hours schedules or no opening to closing hours-schedules at all.

131.    Defendant Hui likewise instructed Plaintiff to edit employees' work-hours, such that time records would reflect no employee working a spread of more than ten (10) hours on any given work-day.

132.    Defendant Hui instructed Plaintiff to submit to the corporate office only the edited time records showing no spread-of-hours eligibility pay for any employee.

133.    Upon hearing Defendant Hui's instructions, Plaintiff raised concerns and objection that what he was asking her to do would violate what they discussed about during the May 31, 2024 phone conference regarding spread-of-hours pay.

134.    Defendant Hui replied by asking Plaintiff: "Are you going to do it or not? Are you going to obey me or not? Should I find another Manager to do this job?"

135.    Fearing to lose her job and remembering Defendant Hui's threat of reporting any complaining or uncooperative undocumented worker to immigration authorities, Plaintiff reluctantly answered that she would obey Defendant Hui's work-instructions.

136.    Upon information and belief, Defendant Schiano knew of and ratified Defendant Hui's work-instructions to Plaintiff about the non-payment of spread-of-hours pay and the method/manner of documenting the same by having two separate sets of work schedules and of time records.

137.    Defendants stopped paying any eligible employee any spread-of-hours pay starting on or about the August 17, 2024 weekly payroll period.

138.    After her August 16, 2024 meeting with Defendant Hui, Plaintiff, fearing that she would lose her job and/or she would be reported by Defendant Hui to immigration authorities, reluctantly followed Defendant Hui's instruction of preparing two sets of work schedules: (i) one, meant for employees to see only, and; (ii) a second set, to be submitted to corporate office only.

139.    After her August 16, 2024 meeting with Defendant Hui, Plaintiff, fearing that she would lose her job and/or she would be reported by Defendant Hui to immigration authorities, reluctantly followed Defendant Hui's instructions of editing or adjusting employee's time records to reflect that no employee had been working a spread of more than ten (10) hours.

140.    After her August 16, 2024 meeting with Defendant Hui, Plaintiff, fearing that she would lose her job and/or she would be reported by Defendant Hui to immigration authorities, reluctantly prepared the store's payroll to indicate that Mr. Enguerra, Mr. Martinez, and Mr. Aziaga each regularly worked eight (8) hours of overtime even though each had worked more than eight (8) hours of overtime each work-week as each had been scheduled and had been working from opening to closing hours, at least five (5) days a week.

141.    Upon information and belief, Defendants were and are able to monitor and have access to the store computer/laptop used by Plaintiff in preparing the work schedules and in editing the employees' time records.

142.    Upon information and belief, Defendants were and are able to control access to the store computer/laptop used by Plaintiff in preparing the work schedules and in editing the employees' time records.

143.   After Plaintiff's August 16, 2024 meeting with Defendant Hui, there had been several employees who worked a spread of more than ten (10) hours on a given work-day, but none were paid any spread-of-hours pay, until the December 2024 complaints happened.

144.   As a result of Defendants' August 16, 2024 instructions, there had been employees working at the Long Island restaurants who were not properly paid for all of their hours of work, including proper minimum wage and overtime pay and spread-of-hours pay.

145.   About three weeks after the August 16, 2024 meeting, or sometime middle of September 2024, Defendant Hui called up Plaintiff to inform Plaintiff that Defendants' Human Resources Department had already noticed that Mr. Enguerra, Mr. Martinez and Mr. Aziaga had been uniformly getting paid eight (8) hours of overtime each week, and had already come to know that nobody was getting paid any spread-of-hours pay anymore.

146.   Defendants, through Defendant Hui, closely monitored and ensured that Plaintiff followed their August 16, 2024 instructions.

147.   Whenever Plaintiff failed to edit or adjust an employee's time records to reflect no spread-of-hours eligibility pay, Defendants, through Defendant Hui, would either call or send a text message to Plaintiff to revise the time records pursuant to their August 16, 2024 instructions, and/or to resubmit the edited time records to the corporate office.

148.   As and by way of an example, on August 31, 2024, Defendant Hui sent a text message to Plaintiff ordering her to change or edit employee Nora's time records. Defendant Hui ordered Plaintiff, thus: "Need to change Nora's time clock for 8/31. Change her clock in to 10:05. Right now, it shows she has more than 10 working hours for that day."

149.    On the same day, Defendant Hui likewise ordered Plaintiff to edit employee Rubi's time records. His text message to Plaintiff read, thus: "Change Rubi clock in to 9:45 AM".

150.    As and by way of another example, Defendant Hui sent another text message to Plaintiff on August 31, 2024 ordering Plaintiff to edit or adjust employee Karina's time records, thus: "Karina checked in for more than 10 hours 8/28. Please minus 1 hour and add it to the next day."

151.    Defendant Hui, who had access to the store computer/laptop used by Plaintiff, instructed Plaintiff to reprint the payroll summary that he had himself already adjusted and for Plaintiff to send it to the corporate office. He sent a text message to Plaintiff that read: "I adjust the hours on the payroll summary. Please change tomorrow and reprint and send to office".

152.    On or about September 4, 2024, when employee Alonzo had to report early at 7:30 AM to oversee a plumbing issue at the kitchen, Defedant Hui sent a text message to Plaintiff, ordering, thus: "You need to make sure you adjust Alonzo's hours to not go over 10".

153.    On or about October 19, 2024, an employee named Froilex Ravelas complained to the Plaintiff that he had not been receiving any more spread-of-hours pay and why his overtime pay seemed off.

154.    Plaintiff responded that she would look into it and that she would forward his concerns to Defendant Hui. Plaintiff did forward Mr. Ravelas's complaint to Defendant Hui who was at Long Island at that time.

155.    On the same day, Plaintiff informed Mr. Ravelas of Defendant Hui's response that he (Defendant Hui) was actually contemplating of increasing Mr. Ravelas's hourly rate another

dollar higher, but that if Mr. Ravelas continued to complain, that he (Mr. Ravelas) could kiss the increase good bye and could look for another job as well.

156.   On or about December 5, 2024, Mr. Ravelas decided to send an electronic message to the Plaintiff formally complaining about not getting paid for all his hours of work, and thereby his overtime payment not being computed correctly, and also about not receiving any spread-of-hours pay.

157.   On or about December 5, 2024, Mr. Enguerra also sent an electronic message to the Plaintiff complaining about not getting paid for all his hours of work and that he was no longer getting paid any spread-of-hours pay.

158.   Plaintiff, on December 6, 2024, forwarded Mr. Ravelas's and Mr. Enguerra's complaints to Defendant Hui and advocated that spread-of-hours pay be re-implemented. She also copy-furnished the Human Resources Department officer.

159.   In her message to Defendant Hui, Plaintiff stated, thus:

> "Yesterday, I received separate email messages from two of my co-workers…. They are basically complaining about their wages not getting paid correctly, meaning, their work hours are not getting counted and paid correctly. I understand where they are coming from. I only follow your instructions to me on how to adjust the computation of their work-hours to save the company from paying spread of hours payment.
>
> I would like to suggest that we go back to our previous method of paying our employees and all of their hours of work shown in their time cards…… [W]e should also give them their spread of hours as we did….. Please advise me as soon as possible how would you like to address their concerns."

160.   On December 6, 2024, Defendant Hui called up the Plaintiff and got mad at her for copy-furnishing the corporate office a copy of the e-mail complaints and for not talking to him directly about the employees' concerns.

161.    Defendant Hui told Plaintiff that any employee complaining about his/her wages was dispensable and replaceable. Defendant Hui instructed Plaintiff to tell Mr. Enguerra and Mr. Ravelas not to talk to other employees about their complaints under pain of immediate termination. Defendant Hui likewise advised the Plaintiff to tell Mr. Enguerra and Mr. Ravelas not to escalate their complaints, or else they would be immediately terminated.

162.    Plaintiff did relay to both Mr. Enguerra and Mr. Ravelas Defendant Hui's response to their e-mail complaints.

163.    In the afternoon of December 6, 2024, Defendants' Ms. Audrey, who upon information and belief was in charge of Defendants' Human Resources Department, emailed Plaintiff that she was allegedly "deeply concerned to learn that employees are not being compensated correctly for their hours worked" and seemed to blame Plaintiff for not implementing her instructions on how to structure employee schedules to ensure compliance with New York spread of hours law.

164.    On the evening of December 6, 2024, Plaintiff replied to Defendants' Ms. Audrey and stated, thus:

> "This is just to put on record that what I have been doing in calculating the wages of the employees is pursuant to the verbal and written instructions of our Vice President, Mr. Roy Hui. He had asked me to prepare two sets of records, namely: (1) the correct records with the correct number of hours oer employee per work day, and; (2) second set, which contains incorrect records to reflect lesser work-hours for employees, meant to avoid the payment of correct wages (overtime and spread of hours pay). I won't be doing a second set of incorrect records if our Vice President did not specifically instruct me to do it. In fact, there were times he called/texted me even on late nights just to instruct me to make further adjustments or amendments to the payroll reports to lessen the company payroll expense.
>
> I do not wish to put our Vice President on bad light, but I do not also want to be blamed. I really feared (I still do) not following his

> instructions, as he is my direct supervisor…..If I disobeyed him, I feared that he would terminate my service, and I don't want to lose my job. So, I had to follow him, even as I have been telling him that this was illegal."

165.    Upon information and belief, on December 7, 2024, one of Defendants' General Managers, by the name of Mr. Pino, who, likewise upon information and belief, was related by blood to Defendant Schiano, spoke to Mr. Ravelas and inquired about his email complaint. Likewise upon information and belief, Mr. Ravelas confirmed with Mr. Pino that he had not been paid spread-of-hours recently, and that his overtime hours seemed to have been incorrectly computed.

166.    Upon information and belief, Defendants' Mr. Pino instructed Mr. Ravelas to list down his unpaid claims, but Mr. Ravelas responded that he did not have the means to do the computation as Defendants had the records of his work-hours.

167.    On the same day, Defendants' Mr. Pino, who was visiting the Long Island restaurants at that time, spoke to Plaintiff and inquired how Plaintiff was able to adjust the time-records of employees to reflect no spread-of-hours eligibility.

168.    Plaintiff showed Defendants' Mr. Pino on the store-issued computer/laptop how she was able to adjust employees' time records pursuant to the verbal and written instructions of Defendant Hui. Plaintiff also informed Mr. Pino that Defendants, from their Florida headquarters, could and would be able to access and monitor the actual time records as well as the adjusted or edited time records. Plaintiff also informed Defendants' Mr. Pino that she had text messages from Defendant Hui that would clearly evidence his instructions for her to adjust employees' time records to evade the payment of correct wages.

169.    Upon information and belief, on December 8, 2024, Defendant Hui called up Mr. Ravelas and asked him how he got the email address of the store. Defendant Hui wanted Mr.

Ravelas to admit that it was the Plaintiff who gave him the email address. But Mr. Ravelas, likewise upon information and belief, answered truthfully by stating that he had known of the store's email address from the former General Manager, Boss Henny, who previously gave it to him. Nonetheless, it was clear from their discussion that Defendant Hui wanted to implicate the Plaintiff about Mr. Ravelas's complaints.

170.    On December 20, 2024, Defendants sent out letters addressed to several employees, including to both Mr. Enguerra and Mr. Ravelas acknowledging that there was a mishandling of worked hours, and that Defendants were unable to calculate the exact spread of hour for past pay periods.

171.    Defendants adjusted Mr. Enguerra's spread-of-hours rate from fifteen dollars ($15.00) to sixteen dollars ($16.00), and made a retroactive pay adjustment equivalent to three hours per week from 08/30/2024 through 12/06/2024.

172.    Defendants adjusted Mr. Ravelas's spread-of-hours rate from fifteen dollars ($15.00) to sixteen dollars ($16.00), and made a retroactive pay adjustment equivalent to two hours per week from 08/30/2024 through 12/06/2024.

173.    Defendants' spread-of-hours adjustment payments made to Mr. Enguerra and to Mr. Ravelas were not based on actual work-hour records available to Defendants themselves, but were mere approximations of the number of days per week that they believed each employee had worked a span of at least ten (10) hours.

174.    Defendants' spread-of-hours adjustment payments made to Mr. Enguerra and to Ravelas did not take into account the period before August 30, 2024 when each employee actually did work more than ten (10) hours on each of several days per pay period.

175.    Defendants' practice of having two separate sets of work schedules and of time/payroll records was expressly directed and dictated by Defendant Hui to the Plaintiff and which practice was known to and condoned and ratified by Defendant Schiano.

176.    The incorrect or untrue, edited set of time/payroll records reflected incorrect number of work-hours for certain employees to avoid the payments by Defendants of spread-of-hours pay and of correct overtime compensation.

177.    Defendants did attempt to make adjustments to the spread-of-hours payments in early December 2024, but still failed to make any adjustments or payments for services rendered before August 2024 that would and should have been paid the correct spread-of-hours rate of pay.

178.    Upon information and belief, Defendants have engaged lawyers and sought counsel to assist them in complying with New York and federal labor legislation.

179.    Defendants were or should have been aware that the New York Labor Law and its Hospitality Industry Wage Order required them to pay their employees an additional hour at the minimum wage for each shift that spanned over a 10-hour period.

180.    Defendants' failure to pay their employees proper spread-of-hours pay was willful, intentional and in bad faith.

181.    Defendants' strategy of threatening any employee complaining of work schedules and work-instructions or any employee being difficult or being uncooperative with work-instructions with loss of employment and/or of being reported to immigration authorities is part of a practice or scheme designed to induce fear and prevent employees from disobeying Defendants' work-instructions no matter that these instructions were unreasonable or unlawful.

182.   Upon information and belief, Defendants' strategy of threatening complaining, difficult or uncooperative employees with loss of employment and/or of being reported to immigration authorities was pursued for the purpose of coercing these employees to continue working for the Defendants.

183.   Upon information and belief, Defendants' threats were pursued with the intent to cause their employees, including the Plaintiff, to believe that they would suffer serious psychological, financial or reputational harm if they did not follow Defendants' work-instructions and did not continue working for Defendants.

184.   Plaintiff reasonably feared that she would suffer serious financial, reputational and other harm, including the possibility of deportation, if she did not implement Defendants' unlawful work-instructions.

185.   Plaintiff reasonably feared that she would suffer serious financial, reputational and other harm, including the possibility of deportation, if she ended her employment with Defendants.

186.   As a direct and proximate result of Defendants' threats, Plaintiff continued working for Defendants despite her opposition to Defendants' unlawful work-instructions.

## FIRST CAUSE OF ACTION
### Trafficking Victims Protection Act of 2003 ("TVPA")
### Forced Labor, 18 U.S.C. §§ 1589, 1595

187.   Plaintiff re-alleges and incorporates by reference each and every allegation contained in preceding paragraphs as if set forth fully herein.

188.   This claim is brought under 18 U.S.C. §1595 of the Trafficking Victims Protection Act, as amended.

189.    Defendants Food Systems, China Chao, Schiano, and Hui subjected Plaintiff to forced labor in violation of 18 U.S.C. §1589.

190.    Food Systems, China Chao, Schiano, and Hui knowingly obtained Plaintiff's continuing labor and services by subjecting Plaintiff to threats of serious harm of, including loss of employment and/or being reported to immigration authorities, and/or of being subjected to deportation, in violation of 18 U.S.C. §1589(a)(2).

191.    Food Systems, China Chao, Schiano, and Hui knowingly obtained Plaintiff's continuing labor and services by using a scheme, plan and pattern intended to cause Plaintiff to believe that, if she did not follow Defendants' work instructions, she would suffer the serious harm of loss of her employment, and/or of being reported to immigration authorities, and/or of being subjected to possible deportation, in violation of 18 U.S.C. §1589(a)(4).

192.    Food Systems, China Chao, Schiano, and Hui knowingly benefited, financially, from participation in the venture of obtaining the continued labor or services of Plaintiff by means of using a scheme, plan and pattern intended to cause Plaintiff to believe that, if she did not obey Defendants' work-instructions, she would suffer serious harm of loss of employment, and/or of being reported to immigration authorities, and/or of being subjected to possible removal or deportation proceedings.

193.    Defendants knowingly provided and obtained the labor and services of Plaintiff by means of serious harm and threats of serious harm, including without limitation, psychological, financial or reputational harm, that was sufficiently serious to compel a reasonable person of the same background and in the same circumstance as Plaintiff to perform or to continue performing labor or services in order to avoid incurring that harm.

194.    Defendants knowingly provided and obtained the labor and services of Plaintiff by means of a scheme, plan, or pattern intended to cause Plaintiff to believe that, if she did not perform such labor or services, she would suffer serious harm, including without limitation, psychological, financial or reputational harm, that was sufficiently serious to compel a reasonable person of the same background and in the same circumstances as her to perform or to continue performing labor or services in order to avoid incurring that harm.

195.    Defendants knowingly used such threats to exert pressure on Plaintiff to continue working for Defendants and to prevent her from not following their unlawful work-instructions, subtly telling her that they would terminate her employment and/or report her to immigration authorities. This was done with the purpose of obtaining Plaintiff's continued labor for Defendants.

196.    Defendants' use of such means to obtain the labor or services of Plaintiff was knowing and intentional.

197.    Defendants knowingly benefited, financially, from participation in the venture of obtaining the continued labor or services of Plaintiff by means of subjecting Plaintiff to threats of serious harm of, including loss of employment, and/or of being reported to immigration authorities, and/or of being subjected to removal proceedings and/or deportation.

198.    As a result of any of the above violations, Plaintiff suffered damages.

199.    As a result of Defendants' acts of forced labor against Plaintiff, the latter suffered and continues to suffer emotional distress, financial distress, and harm to her immigration status due to Defendants' coercive tactics resulting in her forced labor and/or trafficking.

200. The emotional effects Plaintiff suffered and continues to suffer include disrupted sleeping, nightmares, ongoing feelings of fear, difficulty developing trust, anxiety, depression, difficulty concentrating and stress.

201. Plaintiff is entitled to compensatory, liquidated, and punitive damages in an amount to be proven at trial and any other relief deemed appropriate, including reasonable attorney's fees.

## SECOND CAUSE OF ACTION
**Trafficking Victims Protection Act of 2003 ("TVPA")**
**Human Trafficking, 18 U.S.C. §§ 1590, 1595**

202. Plaintiff re-alleges and incorporates by reference each and every allegation contained in preceding paragraphs as if set forth fully herein.

203. This claim is brought under 18 U.S.C. §1595 of the Trafficking Victims Protection Act, as amended.

204. Defendants Food Systems, China Chao, Schiano, and Hui knowingly recruited, harbored, and/or obtained the continuing labor of Plaintiff for the purpose of subjecting her to forced labor in violation of 18 U.S.C. §1590.

205. Defendants Food Systems, China Chao, Schiano, and Hui recruited Plaintiff and caused her to travel or to be transported to various counties in the state of New York, for the purpose of subjecting her to forced labor.

206. As a result of the above violations, Plaintiff suffered damages.

207. Plaintiff is entitled to compensatory and punitive damages in an amount to be proven at trial and any other relief deemed appropriate, including reasonable attorney's fees.

## THIRD CAUSE OF ACTION
**Trafficking Victims Protection Act of 2003 ("TVPA")**
**Conspiring to Violate the TVPA, 18 U.S.C. §1594**

208.    Plaintiff re-alleges and incorporates by reference each and every allegation contained in preceding paragraphs as if set forth fully herein.

209.    Defendants Food Systems, China Chao, Schiano, and Hui conspired with one another to violate 18 U.S.C. § 1589.

210.    Food Systems, China Chao, Schiano, and Hui agreed to obtain Plaintiff's continuing labor and services by subjecting Plaintiff to threats of serious harm of, including loss of employment, and/or of being reported to immigration authorities, and/or of being subjected to possible removal or deportation.

211.    Food Systems, China Chao, Schiano, and Hui agreed to obtain Plaintiff's continuing labor and services by using a scheme, plan and pattern intended to cause Plaintiff to believe that, if she did not obey Defendants' work-instructions, she would suffer the serious harm of loss of her employment, and/or of being reported to immigration authorities, and/or of being subjected to possible removal or deportation.

212.    Food Systems, China Chao, Schiano, and Hui agreed to benefit, financially or by receiving other value, from participation in a venture which has engaged in providing and/or obtaining the labor or services of Plaintiff by the means described above, knowing or in reckless disregard of the fact that the venture has engaged in the providing or obtaining of labor or services by such means.

213.    Each of the Defendants intentionally engaged in acts or deliberate omissions in furtherance of their agreed plan to coerce Plaintiff to continue working for Defendant companies.

214.    Plaintiff suffered damages as a direct and proximate result of Defendants' conspiracy.

215.    Plaintiff is entitled to compensatory, liquidated, and punitive damages in an amount to be proven at trial and any other relief deemed appropriate, including reasonable attorney's fees.

## JURY DEMAND

216.    Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury on all questions of fact raised by the Complaint.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff requests judgment against each Defendant, jointly and severally, awarding her compensatory damages, including emotional distress damages, liquidated damages, and punitive damages for violations of the TVPA; an award of reasonable attorney's fees and costs, as well as pre-judgment and post-judgment interests, as authorized by 18 U.S.C. § 1595(a); and such other relief as the Court deems just and proper.

Dated: New York, New York.
           January 16, 2025.

> */s/ Manuel B. Quintal*
> MANUEL B. QUINTAL, Esq.
> Law Offices of Manuel B. Quintal, P.C.
> 291 Broadway, Suite 1501
> New York, NY 10007
> Tel. No. 212-732-0055
> *Counsel for the Plaintiff*

## VERIFICATION

STATE OF NEW YORK )
                            ) S.S.
COUNTY OF QUEENS )

      I, ROMA ARTES, am the Plaintiff in the within action. I have read the foregoing Complaint and know the contents thereof.   The contents thereof are true to my own knowledge, except as to matters therein stated to be alleged upon information and belief, and as to those matters, I believe them to be true.

                                                                   **ROMA ARTES**

      SUBSCRIBED AND SWORN to before me this 16 day of January 2025, in Queens County, State of New York.

                                               Notary Public

JACOB V KUNJUKUNJU
Notary Public - State of New York
NO. 01KU6401597
Qualified in Suffolk County
My Commission Expires Dec 9, 2027

34